UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **RACHEL E GOODLEY** | **CASE NO.  6:24-CV-01155** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **SUPREME RICE L L C ET AL** | **MAG. JUDGE WHITEHURST** |

<u>**MEMORANDUM RULING**</u>

Before the Court is a Motion for Summary Judgment filed by Defendants Supreme Rice LLC and Arch Insurance Company (collectively "Supreme Rice") [Doc. No. 19]. Plaintiff Rachel E. Goodley ("Goodley") filed an Opposition to the Motion [Doc. No. 28], and Supreme Rice filed a Reply [Doc. No. 31].

For the reasons stated below, Supreme Rice's Motion is **GRANTED**.

**I.   FACTS AND PROCEDURAL HISTORY**

Many say that rice is the anchor of any great dish—simple, essential, and appetizing. From bustling street food vendors in Malaysia to smoky backyard barbecues in the United States, rice stretches over cultures and continents. But even the tastiest grain sometimes brings trouble. This suit involves a rice shipment to the Dominican Republic and a tragic forklift accident that injured a federal inspector.

Supreme Rice mills and sells rice throughout the Gulf Coast.[1] On April 27, 2023, Supreme Rice contracted with a third-party company to ship rice to the Dominican Republic.[2] The contract required Supreme Rice to have its rice inspected

---
[1] [Doc. No. 19-2, p. 1].
[2] [Id. at 5].

and approved by the United States Department of Agriculture's Federal Grain Inspection Service.[3] It also required that Supreme Rice provide proof of the origin, quality, weight, and fumigation of the rice purchased as part of the sale.[4] So Supreme Rice sought an inspection by the Federal Grain Inspection Service,[5] and the agency sent its grain inspector, Rachel Goodley, to inspect the rice at Supreme Rice's facility.[6] During the inspection, a forklift operated by a Supreme Rice employee allegedly struck Goodley and caused severe foot injuries.[7]

Goodley sued Supreme Rice in the 15th Judicial District Court for the Parish of Acadia, Louisiana, the following year.[8] Goodley brought several tort claims and alleged that her injuries were due to Supreme Rice's purported fault, carelessness, and negligence.[9] Goodley's suit was properly removed to this Court on the basis on diversity on August 23, 2024.[10] On June 20, 2025, Supreme Rice sought summary judgment alleging that Goodley's tort claims "should be dismissed by a straightforward application of the 'two-contact' theory" of Louisiana's Workers' Compensation Law, La. R.S. § 23:1020.1, *et. seq*.[11] Goodley opposed the Motion and called Supreme Rice's request as a "last-ditch effort to gain immunity from tort."[12]

The issues have been briefed and the Court is prepared to rule.

---

[3] [Id. at 2].
[4] [Id.]; [Doc. No. 28-2, p. 2].
[5] [Doc. No. 19-1, p. 2]; [Doc. No. 19-2, p. 7].
[6] [Doc. No. 28-2, p. 2].
[7] [Id.].
[8] [Doc. No. 1, p. 1].
[9] [Id. at 2].
[10] [Id.].
[11] [Doc. No. 19-1, p. 1].
[12] [Doc. No. 28-2, p. 1].

## II. LAW AND ANALYSIS

### A. Standard of Review

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant meets their initial burden of showing no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (citation modified). A fact is "material" when proof of its existence or nonexistence would affect the lawsuit's outcome under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgement." *Id.* at 247–48. And a dispute about a material fact is "genuine" only if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But summary judgment is appropriate when the evidence is "merely colorable or is not significantly probative." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (citation modified).

Moreover, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation modified). Courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).

Finally—and importantly—there can be no genuine dispute as to a material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

**B. The Louisiana Workers' Compensation Law**

Under the Louisiana Workers' Compensation Act ("LWCA"), an employer is liable for compensation benefits to an employee who is injured because of an accident arising out of the course and scope of his employment. La. R.S. § 23:1031(A). Generally, the remedy available to an employee under the LWCA is the exclusive remedy against an employer for the injury. *Charlie v. Mobile Modular Mgmt. Corp.*, No. 2:21-CV-00715, 2023 WL 122978, at *2 (W.D. La. Jan. 6, 2023) (citing La. R.S. § 23:1032). And the LWCA's protections extends not only to direct employers but also to statutory employers. La. R.S. § 23:1032. A "statutory employer/employee relationship can arise when, in conformance with La. R. S. § 23:1061, a principal hires a contractor to perform services that are part of the principal's business; in this

4

situation, the principle can become the statutory employer of the contractor's employees." *Nielsen v. Graphic Packaging Int'l, Inc.*, 469 F. App'x 305, 307 (5th Cir. 2012) (citation modified).

The LWCA offers employers two defenses for tort liability: "(1) when the principal undertakes work that is a part of his trade, occupation, or business by means of a contract with another, or (2) when the principal has contracted to perform work and subcontracts all or a portion of the work to another." *Groover v. Scottsdale Ins. Co.*, 586 F.3d 1012, 1015 (5th Cir. 2009) (citation modified). The latter defense is often called the "two-contract" theory of the LWCA. *Id*. And the defense applies when "(1) the principal enters into a contract with a third party; (2) pursuant to that contract, work must be performed; and (3) in order for the principal to fulfill its contractual obligation to perform the work, the principal enters into a subcontract for all or part of the work performed.*" Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 842 So. 2d 373, 379 (La. 2003). Put another way, "this defense only applies when the principal is sandwiched between two contracts." *Frantom v. USA*, No. CV 20-385, 2021 WL 4343949, at *3 (W.D. La. Sept. 22, 2021). When the theory applies, "immunity is extended to all principals along the contractual chain, 'however far removed from the direct employer of the injured worker, who contracted to perform the work in which the injured party is engaged at the time of the injury.'" *Arceneaux v. Bo-Mac Contractors Ltd.*, No. 2:23-CV-01341, 2024 WL 2832909, at *2 (W.D. La. June 4, 2024) (citing *Berard v. Lemoine Co.*, 169 So.3d 839, 845 (La. Ct. App. 2015)).

In this instance, Supreme Rice says that Goodley's claims collapse after a "straightforward application" of the two-contract theory.[13] Supreme Rice says that the defense applies since the company "entered into a contract with a third party; work was to be performed pursuant to that contract; and Supreme Rice entered into a second contract [with the Federal Grain Inspection Service] for all or part of the work in order to fulfill its contractual obligations."[14] Meanwhile, Goodley maintains that the idea that "the government body created to regulate the sale of rice in order to protect consumers," is "somehow hired and employed by entities it is meant to police," is a mistaken and "nefarious" use of the two-contract theory.[15]

Supreme Rice's ask is not "straightforward" at all. It does not appear that any court has faced a similar scenario that this Court faces now. So rather than applying a "straightforward application" of the two-contract theory, Supreme Rice's Motion demands tackling three questions: (1) What is the Federal Grain Inspection Service? (2) Did Supreme Rice contract with the Federal Grain Inspection Service? and (3) Is Supreme Rice immunized from tort liability by the two-contract defense?

The Court will address each separately.

### 1. What is the Federal Grain Inspection Service?

The Federal Grain Inspection Service, an agency of the United States Department of Agriculture, "facilitates the marketing of U.S. grain and related products by establishing standards for quality assessments, regulating handling

---

[13] [Doc. No. 19-1, p. 1].
[14] [Id. at 6].
[15] [Doc. No. 28-2, p. 10].

practices, and managing a network of Federal, State, and private laboratories, that provide impartial official government inspection and weighing services."[16] In other words, the agency evaluates the quality and condition of domestic agriculture grains, such as rice. *See* 7 U.S.C. § 74. Though inspections are only performed on request, the Federal Grain Inspection Service typically requires an inspection on all grain exports, and most contracts for the purchase of rice must be inspected.[17] Authorized "inspectors grade the shipments according to the level of infestation, and in order to receive a federal grain inspection certificate, fumigation is required." *St. John the Baptist Par. Sch. Bd. v. Degesch Am., Inc.*, 617 So. 2d 234, 236 (La. Ct. App. 1993). (citation modified). "[T]his certificate is a commercial document showing compliance with fumigation requirements." *Id.*

### 2. Was There a Contract?

Supreme Rice and Goodley disagree as to whether the company's request to the Federal Grain Inspection Special to inspect its rice pursuant to its Dominican Republic shipment amounts to a contract. Whereas Supreme Rice claims that its request constituted a valid contract with the agency, Goodley accuses that characterization as "quite frankly, absurd."[18]

Start with the basics. "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. Keep in mind that "[a]n obligation cannot exist without a lawful cause." La. Civ. Code

---

[16] [Id. at 2].
[17] [Id.].
[18] [Id. at 10].

7

art. 1966. "Cause is the reason why a party obligates himself," La. Civ. Code art. 1967, and "[w]here this is no 'meeting of the minds' between the parties, there is no consent, thus no enforceable contract." La. Civ. Code art. 1927; *Ricky's Diesel Serv., Inc. v. Pinell*, 906 So. 2d 536, 538 (La. Ct. App. 1989). Goodley maintains that Supreme Rice did not create a contract with the Federal Grain Inspection Service since the company was legally obligated to have its grain inspected and the agency was only "doing what it was created to do, providing impartial inspection and weighing services."[19]

At first glance, Goodley makes a logical point. Supreme Rice's theory likely fails in nearly any other scenario. Does a pharmaceutical company "contract" with the Federal Drug Administration when it applies for the agency's approval of a new medication? Does a recent law graduate "contract" with her state's bar association when she seeks admission to practice law? Does a teenager "contract" with the Department of Motor Vehicle when he applies for a driver's license? The answers are no, no, and no. In each of these instances, the candidate seeks approval from a regulatory body and in doing so, will often have to pay some fees and sign some forms along the way. The same is somewhat true here: Supreme Rice paid some fees and signed some forms to get its rice inspected. However, the distinguishing factor is the Federal Grain Inspection Agency itself—and this "distinguishing factor" turns this Court's answer as to whether there was a contract from a "no" to a "yes."

Goodley says that the Federal Grain Inspection Service is the regulatory body created to police companies like Supreme Rice, and seeking a legally required

---

[19] [Id. at 12].

8

inspection does not create a contract with the policing agency. But Goodley's rationale has a glaring blind spot: while Supreme Rice is legally obligated to have its grain inspected, it is not legally obligated to have the *federal agency* conduct those inspections. The Federal Grain Inspection Service does not conduct all grain inspections single-handedly; the agency issues licenses to other state agencies and private entities to conduct inspections as well. 7 U.S.C. §§ 77, 84. The agency also delegates authority to state agencies to perform all or specified functions involved in official inspections for grains set to be exported. 7 U.S.C. § 79. And the agency has delegated that authority throughout Louisiana. *See St. John*, 617 So. 2d 234 (defendants were private grain inspectors); *Moore v. Thornwell Warehouse Ass'n*, 524 So. 2d 828 (La. Ct. App. 1988) (same).

What this means is that while the Federal Grain Inspection Services sets the "standards for quality assessments,"[20] and regularly conducts inspections to ensure compliance with those standards, the agency allows state and private entities from conducting those inspections as well. So even though Supreme Rice was obligated to seek an inspection, it was not obligated to have the federal agency conduct it.

If Goodley remains unpersuaded by this Court, she should glance at her own statements and the evidence she's provided. She acknowledged that the Federal Grain Inspection Service "manag[es] a network of Federal, *State, and private* laboratories that provide impartial official government inspection and weighing services."[21] Goodley also attached the agency's clarification that "rice industry

---

[20] [Id. at 2].
[21] [Id. at p. 1-2] (emphasis added).

9

businesses are under no obligation to use [its] services."[22] What's more, Goodley—an employee of the federal agency—called companies like Supreme Rice "customer[s]," and answered affirmatively when asked during her deposition whether these companies "contract" with the federal agency to ensure that their rice meets appropriate standards.[23] The signed agreement between Supreme Rice and the Federal Grain Inspection Service speaks for itself as well:[24]



---

[22] [Doc. No. 28-4, p. 47].
[23] [Doc. No. 19-3, p. 85-86].
[24] [Doc. No. 19-2, p. 4].

Goodley tries to downplay the signed agreement as nothing more than Supreme Rice's application to have its rice "inspected regularly in order to obtain a reduction in the fees associated with having its rice inspected."[25] But the Court can't ignore the obvious: the agreement looks like a contract, reads like a contract, and calls itself a contract. Supreme Rice was under no obligation to have its grains inspected by the federal agency; it could have relied on other state or private inspection entities. Instead, it made an agreement with the Federal Grain Inspection Service that created reciprocal obligations. And Goodley offers no contrary evidence to suggest otherwise. As a result, Supreme Rice had a valid and enforceable contract with the Federal Grain Inspection Service.

### 3. Does the Two Contract Theory Apply?

As mentioned above, the LWCA's two-contract defense "only applies when the principal is sandwiched between two contracts." *Frantom*, 2021 WL 4343949, at *3. Goodley claims that Supreme Rice "was not a general contractor as defined by Black's Law Dictionary," nor was the Federal Grain Inspection Service a subcontractor.[26] But there's no need to cite dictionaries when the statute is clear. The LWCA describes the defendant-employer as the "principal." *See* La. R.S. § 23:1032. The "principal" is any person who "undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof." La. R.S. § 23:1032(A)(2). When a principal contracts to execute any work, which is a part

---

[25] [Doc. No. 28-2, p. 12].
[26] [Id.].

11

of his trade, business, or occupation, the person with which the principal contracts is considered the "contractor." La. R.S. § 23:1061(A)(1). In this instance, Supreme Rice contracted to mill and ship rice to a third-party company in the Dominican Republic. So Supreme Rice's role fits neatly into the LWCA's definition of a "principal." Then Supreme Rice contracted with the Federal Grain Inspection Service to "fulfill its obligation to perform the work" demanded by Supreme Rice's contract with the third-party company. *Allen*, 842 So. 2d at 379 (citation modified).

Again, the two-contract defense requires that (1) Supreme Rice contracted with a third party; (2) pursuant to that contract, work must have been performed; and (3) to fulfill its obligation to that contract, Supreme Rice contracted with some other party tasking it to perform all or some of the work. *Allen*, 842 So. 2d at 379. Supreme Rice provided uncontested evidence satisfying all three of those steps. As a result, Supreme Rice is entitled to statutory immunity from Goodley's LWCA tort claims.

### III. CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Supreme Rice's Motion [Doc. No. 19] is **GRANTED**.

MONROE, LOUISIANA, this 24th day of July, 2025.

							_____
							Terry A. Doughty
							United States District Judge